Good morning, Carolyn Wiggins standing in for Alice McClare this morning from the Federal Defender's Office. I'd like to save my last five minutes for rebuttal. Your Honor, what this case is about is a prosecutor who had an extremely weak murder case. He had no physical evidence. He had only one eyewitness who admitted that she had been And because of the weak nature of the government's case, the prosecutor made an effort to sort of paint the whole scene of this case as all about the Stockton drug world and murders that happen in the Stockton drug world. And he overstepped the prosecutor's role several times and abused his status to lead the jury to believe that our client, Mr. Arellano, was involved in the Stockton drug world and that he had pressured people to lie for him in two different cases. And in doing that, he unfairly used character evidence to gain a conviction in this case. In the meantime, Mr. Arellano's defense attorney did not act vigorously in protecting his client from these improper innuendos that the prosecutor made throughout the trial. I'd like to start by talking about the prosecutor's closing argument involving testimony by the defendant's wife's grandmother. And I'd like to actually read the relevant portion, because I think it's important, the words the prosecutor used. In his closing argument, and I'm looking at the E.R. tab 5, starting on page 422, he's talking about Mrs. Cesari's testimony, and he says, now, what's the significance of that? Well, the significance, obviously, is that Esther Cesari has been told what to say by her granddaughter. Quote, you know, Grandma, if you just say this, Rubin really didn't do this crime. If you'll just say this, you'll get him out of a lot of trouble. The prosecutor, end quote. So Mrs. Cesari, being basically an honest lady at heart, came in here and just was trying to say what she had been told to say. Now, I think there's an important difference between a prosecutor arguing to a jury that you can, in first, a witness is lying by facts that are in evidence, or by their bias because they're related to someone who's in trouble, and actually asserting that a conversation occurred where somebody pressured this witness to lie. And he doesn't say you can infer that this happened. He says, you know what happened. This conversation happened. I think doing that, especially in the context of a closing argument where the witness has already left the stand, the defense can't put on any additional evidence to rehabilitate Mrs. Cesari's, is especially prejudicial. The next item I'd like to talk about is the introduction of drug, drugs and drug paraphernalia by the prosecutor in this case. Can I ask, I was wondering whether that really was harmless error at that point, if it was error, because didn't, didn't we already know that he had been convicted of drug violations? Wasn't that evidence in? Monica Luna, the government's witness, had testified that the victim and Mr. Arellano were involved in drug trade. Mr. Arellano had been impeached by the fact that he had two prior felony convictions. And I think that was all proper. But we draw a line between that evidence and evidence of the triple beam scale and the bag of marijuana that the prosecutor introduced into evidence during the cross-examination. That was kind of irrelevant, though, wasn't it? We all, we knew he was a drug dealer. Well, we knew Monica Luna testified that he was a drug dealer, and he had prior drug convictions. He kept the stand, so we got in on those two convictions. So the fact that he had this in his house seems almost surplusage or irrelevant. I don't see in that, it's hard for me to find harm. Well, I certainly agree that it actually wasn't relevant to any of the issues at trial, which is. Well, was it harmful? I think it was harmful. Because? Because it was part of an overall scheme to convince the jury that Mr. Arellano was a dangerous drug dealer who had pressured people into lying. The, you know, Ms. Luna, who testified for the government, was not an unimpeachable witness, and therefore, the jury may not have been convinced that he, that Mr. Arellano was currently dealing drugs based on the proper evidence that it received. But getting this triple beam scale that drug dealers commonly use and the bag of marijuana, that was just, it was harmful, and it had nothing to do with the issues at trial. Well, what was really harmful was your client saying, well, I just used it to weigh vegetables. Well, you know, I have a feeling that he probably wasn't prepared for being confronted with that, because I don't think, I think that. That's another problem, isn't it? That you have a feeling he wasn't prepared, but there's no evidence as to whether he was actually prepared and how long, for how long he was prepared, right? There's no evidence developed, because one of your other claims is inadequate preparation by counsel and ineffective assistance of counsel claim. Correct. And there's been no evidence you're hearing on that issue. It's, it was requested, but there's never actually been one. So there was a request for one on that issue? Your Honor, I know that in the, I'm sure that part of the habeas in district court requested an evidentiary hearing on the ineffective assistance of counsel claims. That would be our normal practice, and I'd be happy to find that. But, I mean, isn't it just possible to ask Mr. Arellano, you know, how long did your counsel talk to you? And put in an affidavit or something. I mean, it's, it seems to me that there doesn't seem to be anything in here as to whether he was prepared. I mean, if the allegation is he wasn't adequately prepared, doesn't there have to be something in back of that? Well, Your Honor, I think that with respect to this, this all started with the weakness of his answer when confronted with the question. And there's, the allegation really is not that Mr. Piggott didn't adequately prepare him. That's not our IAC claim. I thought that was part of your claim. The IAC, the ineffective assistance of counsel claim is really that the direct examination was, exposed him to liabilities and was totally ineffective. And in fact, by. What do you mean it was ineffective? You mean putting him on the stand at all? Putting him on the stand without having him deny culpability was ineffective assistance of counsel. And the prosecutor picked up on the fact that he was never asked if he committed the crime, he never denied it, and used that in his closing argument to tell the jury, I'm sure you noticed, he's never denied committing the crime. You really mean the rebuttal was ineffective, or the redirect was ineffective, because he had, the counsel had a plan, right, for the direct. It was going to be very narrow, and he was hoping to keep out some evidence. Okay. The evidence all came in on cross. So I thought your argument was that the redirect was ineffective because by that time he should have known that he wasn't, the counsel should have known he wasn't going to be able to limit it, and therefore he should have done a fuller redirect. Or am I wrong? Do I misunderstand the situation? The claim is that either on direct or I suppose on redirect, he should have brought out a denial of committing, of doing the shooting. The ineffective assistance of counsel has to do with not bringing out that fact. There are other claims, too, but not preparing him for cross was not, is not one of the claims, actually. Your Honors, I think that the, with respect to allowing in the drug evidence, the triple-beam scale and the bag of marijuana, the claim is that Mr. Piggott, the defense attorney, should have made a relevance objection and preserved that issue and, more importantly, actually kept the evidence away from the jury. I thought he did some cleanup objection on that, didn't he? Didn't he do something, like ask for mistrial? I forgot now. I thought he did something with regard to that drug evidence. Your Honor, I think, I think he did, but the point is that he didn't do it timely and the evidence did come before the jury. And, again, our contention is that this plays into an overall scheme to use character evidence. Wait, if Your Honors would like to continue, or? Go ahead. Thank you. We were bad students. We were bad students talking when we shouldn't have been. Oh, quite all right. But if there's any questions I can address, I can ask. No, thank you. Keep making your argument. Okay. Your Honor, I also just want to talk briefly about the closing argument that Mr. Piggott made in which he tells the jury that he agrees his client has something to hide. Again, in the context of a trial that was all about the credibility of the ---- But I thought he was saying, yes, you know, if you thought he was acting like he had something to hide, the fact that he was involved with drugs, and that's how he was explaining it. I thought that was a strategic move on his part to explain away the fact that you shouldn't think he was trying to hide that he committed a murder. That's not what he was trying to hide. I thought that was the context. Well, Your Honor, I think that, again, there hasn't been an evidentiary hearing on what was ---- what possible tactical reason could the defense have to use that. But I think in the context of a trial where it's all about credibility, it's not worth it to try that kind of tactic. I mean, they had admitted that, yes, he used more than one name because he was afraid of deportation. And that certainly was understandable. But to concede that he's got something to hide during closing argument was prejudicial. I know the Attorney General's office has also argued that this claim wasn't fully exhausted. And the district judge disagreed with that argument and said he presented it to the State Supreme Court. They didn't comment on exactly why they rejected that claim, but we have to assume we can't assume it was for procedural default and, therefore, that was properly presented. And I don't know if Your Honors have any questions on that. No, thank you. I'll reserve my remaining time. Thank you. May it please the Court, Ward-Campbell for the Respondent. This case is basically one in which the prosecution had an eyewitness. The defense presented an alibi that was, I think, considered ultimately implausible. The jury decided what to believe. Well, I mean, maybe the jury thought it was implausible, but I don't see why it's facially implausible. He says he was at his step-grandmother's house. Well, I mean by that, that ultimately, I think when the evidence was presented and when the defendant testified as to about, for instance, how he had been making his living during Cross, the fact that he had a home that he was still renting in Stockton at the same time he was with the grandmother, the grandmother. Say that again. Well, when the defendant testified ultimately under Cross, part of what the prosecution began to develop were issues regarding the fact that while there was a claim that, in fact, he was in San Jose all day on May 12th, 1988, when the murder occurred, and the grandmother had testified he had been there all month, and he was also, in fact, renting an apartment in Stockton at the same time, still making rental payments on that. When the grandmother testified, she claimed that there was evidence that would have indicated that he had been in San Jose on May 12th but hadn't bothered to bring along the corroboration with her that would have shown that. There were just, I think, a lot of legitimate questions raised about how firm this alibi was that he was in Stockton on May 12th. The jury heard both sides. They made their decision. None of the claims that are being raised now really establish that there was any fundamental unfairness in that determination, that there was anything unreliable about it or anything that really undermines confidence in the judgment the jury ultimately made in that case. Of course, the prosecutor said almost directly that the grandmother was lying. He, I think, made a reasonable inference based on how the grandmother testified, for instance, in testifying that she hadn't talked to anybody about what she was going to say. But what he said was the daughter, in fact, the daughter told her this, as if that was an actual fact. He certainly conjured up the idea that the woman, the grandmother was testifying, was biased in favor of the defendant because it was the boyfriend or husband of her granddaughter. It's not just that. He represented to the jury that he was aware of facts that were not in evidence. The fact was, he said, that the daughter had talked to the grandmother and told her these things. Now, he said to the jury, he said, you know what happened. And that was an inference from the facts that this woman was testifying in favor of the defendant because he was the boyfriend or husband of her granddaughter. The granddaughter, in fact, the grandmother had testified was one person she had had contact with prior to the testimony. And it's a reasonable inference. Given the plausibility of the grandmother's testimony that she hadn't talked to It might be an inference that the jurors might want to draw. That's correct. However, they can't infer that she actually testified, that the granddaughter actually testified to this in court, which is what it sounds like in this argument that he's making. The granddaughter said this, which she didn't say. I mean, if he had said something like, you know, you can infer that somebody told the grandmother what to say. You know, that would have been better. At least it would have implied that there wasn't, it would have said there wasn't any evidence in court if he's asking them to infer. But he says, this is the testimony that happened. Well, no, well, certainly the jury heard the testimony. And there was no, there would be no reason for the jury to believe that there was testimony given that they didn't hear. And there was certainly no testimony there. No, that's the whole point. He said, in fact, she was simply saying what she was told to say by her granddaughter, which suggests that the government, the prosecutor, is aware of facts that the jury isn't and represents that to the jury as a fact. And, of course, the jury is specifically instructed. Not to pay attention to the process. That what the prosecutor says is not evidence and that they pay attention only to the evidence in the case. And I would agree with how the district court, when they read this in context, viewed this, that this may have been an overly dramatic way of saying exactly the point I'm trying to get across now, was that there was a reasonable inference that the grandmother had appeared to testify the way she had because she was biased and was motivated to do it by her love for her granddaughter. And we would submit that that certainly does not, did not so infect this trial with a fundamental inference that would justify the jury. Well, this was a really close case, wasn't it? I mean, you have this woman who is a highly questionable character who saw her boyfriend killed, fled. I don't know what she did. She got stuff out of the car, including a gun. She didn't go to the police until the next day, and she left town. She actually talked to the police briefly that night and then went in the next day. 9-11. Identified Mr. Arellano. She made a 9-11 call, said her boyfriend had been shot, but she didn't think too much about that. She left him on the street not knowing whether he was dead or alive. Went home, got the gun out of the car, went home, then took off with drugs and the gun to some other city. And that's the whole case, that she said that this other person did the shooting. That's the case. There's no other evidence connecting him to this case. Well, I think it's important. Well, is there any other evidence? Oh, no, no. This case is based on her eyewitness testimony. That is correct. I don't contest that. But I think when you compare it, frankly, comparing her testimony with what the defense ultimately presented, the jury came in the next day after closing arguments in this case. I'm not too sure it really was in the end when the credibility of both sides was compared that it was that close a case, actually. Are you saying that defense counsel was ineffective? Not at all. I'm just saying that the problem they had was that they really didn't have any compelling or ultimately persuasive support for the defense of mistaken identity or alibi in this case. Ms. Luna identified the defendant the day after the murder. She wouldn't have any idea one way or another what alibi he may or may not have. She described him accurately. She knew him. When the defendant testified, he confirmed that he knew the victim, that he and the victim had had problems. There was your motive. The two defense witnesses who testified, the other eyewitnesses, about the only thing they really questioned was Ms. Luna's description of the events in the immediate aftermath of their crime. Their description of the events otherwise, that they either overheard or witnessed, were actually pretty consistent with the way Ms. Luna described it as to how the crime occurred, how the gunshots occurred, this type of thing. The defendant himself, when he did testify, was equivocal about what he did his best to distance himself from both Stockton and the fact that he was involved in drugs during this case, but he could not really resist being pulled back into it. And that was the significance of his prior record and the significance of what was found in that house, ultimately, was that he was, in fact, a drug dealer, someone who did have problems with the victim. And all those things came together and ultimately truly showed that Ms. Luna's testimony actually, for the most part, and she was impeached and she was subjected to a lot of impeachment, ultimately gave the most consistent and believable version of events in this case, which is why the jury ultimately convicted the defendant. What was the point of putting him on the stand? The defendant? Yeah. I don't know if the record really reveals if he insisted on it or not, but the fact is... Insist, going on the stand and just saying, I use many names instead of one? And what else did he say? Well, what he testified to in direct was he was in San Jose all day on May 12th, 1988. And what was that supposed to accomplish? That was to put him somewhere besides Stockton on May 12th, 1988. That's to say that he didn't commit the crime. That's exactly right. All right. But he didn't say I didn't commit the crime. He just said I'm in Stockton. What was the point of saying I'm in Stockton? Did the counsel think that that would protect him against cross-examination? Actually, counsel was pretty successful initially in keeping the cross limited, but the prosecutor was pretty persistent and ultimately bored in on it. It was, and I think once again I would agree with the district court, there was, I think, a decision made here that it was important for the jury to hear the defendant himself say where he was on the day this crime occurred. But not to say I didn't commit the crime. I mean, I think a jury might be able to understand someone not taking the stand. But to take the stand and not deny that you committed the crime? Well, if you say you're in San Jose all day on May 12th, 1988, and the crime was committed in Stockton that day, you have said you didn't commit the crime. Okay. And then you've opened yourself up to complete cross-examination. You would have been opened up even if you denied it. If you deny committing a crime, you're open. Okay. So then what was the point of his not denying it? He did deny it. Well, Your Honor, I would say that, in fact, he denied it by what he was saying. If what we're talking about here is the difference. But the prosecutor told the jury that he didn't deny it. He pointed out that he didn't answer that direct question. No. Well, so there is a difference. At least the prosecution thought so. It went to something that the prosecutor argued. But it doesn't change the fact that, in fact, the defendant obviously denied committing the crime because he denied being in Stockton on that day. So you think that the defense counsel, when he chose this tactic, was saying, I'm going to put on a complete defense. It's the same as a denial, but I'm going to say when the trouble is denying it. I think he had a grandmother. He had another witness who said he was in San Jose that day and he was putting the defendant on to face the jury and tell the jury, that's where I was. That's what I was doing on that day. So I wasn't in Stockton. And the reason he didn't deny it was because it was unnecessary to deny it because he had already said he was in Stockton. By saying he was somewhere else, he had already accomplished that. It would have been redundant to say I didn't commit the crime. It would be redundant. Unless the prosecution was going to argue he could have been in two places at once and therefore it wasn't a complete denial, I don't think they couldn't do that. They had to attack the credibility of the crime. The only reason not to ask him whether he committed the crime was that they had already done that indirectly. He had already done it by saying, yes, if you want to call it impliedly or indirectly, he had already done it by saying he was in San Jose all that day. Don't you think it would help if you really think that that's what the lawyer is going to say if we have a hearing in this case, that the defense lawyer will say, well, I didn't ask him whether he committed the crime because I had already gotten an indirect answer and that was enough? The lawyer, I think, definitely had the idea that he would have some success, he thought, in limiting cross-examination because he was trying to keep it limited to one day, testimony about what was going on on one particular day. And by doing so, the hope would be that they would not be able to get exposed in the cross-examination about other things that the defendant had been involved in both before and after that day. How do you limit it to a day by not asking him whether he committed the crime? I'm sorry, Your Honor. Can you repeat that question? You tried to limit the cross to a day. Mm-hmm. But if you had asked him about did he commit the crime, that would have opened it to more than a day? I think that from what I can tell, what I read looking at the objections and the arguments that were made by the trial counsel in the case, the hope was to limit the amount that the prosecution could potentially cross-examine the defendant about what his activities were both before and after that date by limiting his testimony specifically to his activities on that one day. Now ultimately, that was an unsuccessful tactic. But that was, I think, the ultimate goal. How would it be broadened by him saying, I didn't commit the crime? Because then you get questions, you could open it up, you would open it up to questions about relationships potentially with the victim that might indicate motive. You would open it up potentially to questions about whether or not you were involved in drug-dealing activities with the victim, which could lead to what was going on both before and after that date. Ultimately, the prosecution was able to accomplish that. That happened. It did. I'm suggesting to the extent that there was a tactic chosen to try to limit the cross, it may have turned out to be an unsuccessful tactic. Even the district court acknowledged that. That does not necessarily mean you're ineffective or unreasonable in what you choose to do. Then your answer to why he didn't ask him on rebuttal, did you commit the crime, is that he had already answered the question by saying he was in San Jose. Ultimately, that was a way of denying that he did the crime. But when all this adverse information came in and he had him on redirect, on rebuttal, and he didn't ask him whether he committed the crime, the reason is that it would have been redundant? I think at that point he was sticking to his position that he was in San Jose all that day. There's nothing to add to that. In fact, by asking that question, potentially you could be indicating some concern that you had not adequately made that clear to the jury or that you were backing off of that position. Backing off of what? Yeah, you might be backing that you're expressing by now going back and now saying in a different way that you're denying that you were the murderer, that you are, in fact, concerned about the confidence you have or the credibility you have and your continued position that you were in San Jose all that day and therefore could not have committed a murder in stock in that day. I thought that might confirm that position. I think it's something that might be played with either way. But I would think that it would be reasonable for a defense attorney to conclude that they had made that clear to the jury that that was their position. If he had only been able to explain that to the prosecutor who wouldn't have pounded home to the jury that here's a guy who never denied he committed the crime. He didn't seem to understand that. Your Honor, that's a rhetorical device that the prosecutor used, and I don't think the jury needs to ever explain to it that no matter what he may or may not have explicitly denied, his position was I was in San Jose all day on the day that the murder occurred in the stock. So whatever rhetorical device the prosecutor may have used to deal with that, I don't think renders the defense decision on how to handle the direct to be unreasonable or ineffective. Thank you, Your Honor. I'll try to respond to a couple of other things, and we've covered a lot here. Actually, given the court's questions to counsel and the questions they've had now, I don't have anything else unless you have further questions for me at this point. Okay. Thank you very much. Thank you very much. Certainly. Thank you. The case just argued will be submitted? Oh. Rebuttal. All right. There's no requirement. I'm going to be extremely brief because I don't have a lot to add. I just want to speak briefly to the question of Mr. Piggott's decision about how to conduct his direct and his rebuttal of his witness, our client. And I think that if you look at the – there was a motion for mistrial at the end of the mistrial. The transcript of that is contained at tab 7 of the ER. And on page 500, he, Mr. Piggott, goes into his reasons for not having his client deny the crime. And it does appear that it was a misguided effort to limit cross. And I think, you know, he might have ineffective assistance of counsel. If you make a strategic decision that's based on a misunderstanding of the law, that's ineffective assistance of counsel. And for that reason and the other reasons covered in the brief, we'd ask you to reverse. Thank you. Thank you. The case just argued will be submitted? Next case, final case on the calendar for the morning is Truroff v. Piggott.
judges: B. Fletcher, Reinhardt, Restani